IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 127,196

In the Matter of CARL F.A. MAUGHAN,
*Respondent*.

ORIGINAL PROCEEDING IN DISCIPLINE

Original proceeding in discipline. Oral argument held May 10, 2024. Opinion filed June 14, 2024. One-year suspension.

*Alice L. Walker*, Deputy Disciplinary Administrator, argued the cause, and *Gayle B. Larkin*, Disciplinary Administrator, was with her on the formal complaint for the petitioner.

No appearance by respondent.

PER CURIAM:  This is an original attorney discipline proceeding against the respondent, Carl F.A. Maughan, of Wichita, an attorney admitted to practice law in Kansas in September 1997.

On October 6, 2023, the Office of the Disciplinary Administrator (ODA) filed a formal complaint against the respondent alleging violations of the Kansas Rules of Professional Conduct (KRPC). On that same day, the ODA filed a notice of hearing advising the respondent that a hearing on the formal complaint was scheduled for December 7, 2023.

On October 27, 2023, the respondent filed an answer to the formal complaint. On November 23, 2023, the respondent filed a proposed probation plan.

1

On December 7, 2023, a panel of the Kansas Board for Discipline of Attorneys held the hearing on the formal complaint. The respondent appeared pro se. At the beginning of the hearing, the parties informed the panel of their stipulation to the facts alleged in the complaint and that, based on those facts, the respondent's conduct violated KRPC 1.7 (2023 Kan. S. Ct. R. at 342) (shall not represent a client if the representation involves a concurrent conflict of interest), KRPC 1.8 (2023 Kan. S. Ct. R. at 350) (shall not enter into a business transaction with a client or knowingly acquire an ownership, possessory, security, or other pecuniary interest adverse to client), KRPC 1.15 (2023 Kan. S. Ct. R. at 372) (shall hold property of clients or third persons that is in a lawyer's possession in connection with a representation separate from the lawyer's own property), and KRPC 8.4(d) (2023 Kan. S. Ct. R. at 433) (engage in conduct that is prejudicial to the administration of justice). As a result of the stipulation, the panel received evidence to consider aggravating and mitigating factors to assist in making recommendations for discipline. The panel set forth its findings of fact and conclusions of law, along with its recommendation on disposition, in a final hearing report, the relevant portions of which are set forth below.

"*Findings of Fact*

. . . .

"*2016-CR-001428 Criminal Case*

"10.     On May 6, 2016, a vehicle occupied by B.B. and T.A. struck another vehicle, killing two occupants and seriously injuring the other occupants. B.B. was charged in Sedgwick County District Court criminal case number 2016-CR-001428 with two counts of involuntary manslaughter, severity level four felonies; three counts of aggravated battery, severity level five felonies; one count of aggravated battery, a

2

severity level eight felony; and one count of driving while license is suspended, a class B nonperson misdemeanor.

"11.    T.A. was injured in the crash and identified as a victim in the criminal complaint.

"12.    After the May 6, 2016, crash, T.A. and her husband, G.A., contacted the respondent and offered to pay the respondent to represent B.B. in 2016-CR-001428.

"13.    The respondent agreed to represent B.B., and G.A. paid the respondent a flat fee of $30,000.00. The respondent deposited the payment directly into his operating account, not his trust account.

"14.    When the respondent's representation of B.B. began in May 2016, the respondent also represented T.A. On April 11, 2016, T.A. hired the respondent to represent her in a Sedgwick County traffic case. That representation concluded on February 16, 2017. The respondent had also represented T.A. in previous criminal cases.

"15.    On May 20, 2016, a first appearance was held in the 2016-CR-001428 matter. Sean Hatfield, an associate with the respondent's firm at the time, observed the first appearance but did not enter his appearance.

"16.    On May 23, 2016, the respondent and Mr. Hatfield were listed in the court's records as attorneys for B.B. in the criminal matter. That same day, Mr. Hatfield entered an appearance on B.B.'s behalf. The respondent filed an entry of appearance on B.B.'s behalf on September 20, 2016. Although the respondent's entry of appearance was filed much later, he was the attorney who primarily handled the representation of B.B. from May 2016 forward.

"17.    On October 5, 2016, a preliminary hearing was held. At the beginning of the hearing, the State notified the district court that at the conclusion of the presentation of evidence, the State planned to ask the court to bind B.B. over on the crimes charged,

3

and, if the evidence established probable cause, two alternative counts of second-degree reckless murder, severity level two person felonies.

"18.    T.A. testified for the State during the preliminary hearing, identifying B.B. as the driver of the vehicle that caused the crash.

"19.    During the preliminary hearing, the respondent argued that the State's charges against B.B. should be dismissed because T.A. was driving the vehicle when the crash occurred.

"20.    The district court authorized the State to file the new second-degree reckless murder charges, found probable cause, and ultimately set the case for trial.

"21.    On May 5, 2017, a motion hearing was held, during which the respondent disclosed to the district court his previous representation of T.A. The respondent said that he had signed waivers from both T.A. and B.B. The court encouraged the respondent to file the waivers; however, the respondent did not do so.

"22.    During the motion hearing, the respondent moved to suppress T.A.'s testimony. The respondent stated, '[e]ven through [*sic*] I have a written waiver and I don't represent her—I have represented her in the past. I felt sort of residual, needed [*sic*] to kind of protect her.' The motion to suppress was denied.

"23.    During the disciplinary hearing, the respondent testified that T.A. was in the courtroom when he made that statement to the district court. The respondent testified that he made the above statement during the motion hearing to send a signal and to encourage T.A. to seek counsel for advice on asserting her Fifth Amendment right not to testify in the proceeding. The respondent said he believed it would be to both B.B.'s and T.A.'s benefit if T.A.'s testimony was suppressed.

"24.    T.A. did ultimately testify during the jury trial. The respondent said during the disciplinary hearing that he thoroughly cross-examined T.A. and did not hold

4

back during cross-examination because T.A. was a former client.

"25. B.B. testified at the jury trial that he had pulled the vehicle over and moved to the backseat of the car prior to the crash. B.B. further testified that while he was in the backseat, he felt the car accelerate and assumed T.A. had moved into the driver's seat.

"26. B.B. was found guilty of all counts and sentenced to 728 months in prison and 6 months in jail.

"27. B.B. appealed the conviction. During the appeal, B.B. moved to stay appellate briefing and remand the matter to the district court for a *Van Cleave* hearing to determine if the respondent provided ineffective representation based on the conflict of interest. The Court of Appeals granted the motion.

"*Van Cleave Proceeding and Client Waivers*

"28. The *Van Cleave* hearing was held on June 13, 2019. The issue of client waivers came up during the *Van Cleave* hearing.

"29. During the disciplinary investigation, the respondent provided his computer file for the B.B. case to the disciplinary administrator's office. A document titled '2017_01_25_waiver of conflict_[B.B.]' was found in the respondent's file. This document was a waiver signed b[y] T.A. on September 21, 2026, which stated:

'I, [T.A.], am a former client of the Maughan law group and a potential witness in the above captioned case. I am aware that the above named defendant is being represented by the Maughan Law Group. I am aware that this creates a potential for a conflict of interests and have been fully apprised of the nature of the potential conflict of interest. Specifically, I have been advised that if I cam [*sic*] called as a witness in the above captioned case the Maughan Law Group will have an obligation to represent the best interests of the defendant and that the

5

interests of the defendant in this case may conflict with my personal interests. Being fully aware of the nature of this conflict and having been advised that I have a right to seek independent counsel for advice on this matter, I hereby waive any potential conflict of interest arising from the Maughan Law Group's representation of [B.B.] and me.'

"30.     In his file, the respondent also had a draft document titled '2016_05_23_Client Consent to 3rd Party Payment,' which included B.B[.]'s name and reference to the 2016-CR-001428 case. This document was unsigned.

"31.     Further, there was a draft in the respondent's file titled '2016_05_23_new engagement letter FLAT FEE_1,' which included B.B.'s name and reference to the 2016-CR-001428 case. This document was also unsigned.

"32.     The engagement letter stated that the flat fee of $30,000.00 was considered a minimum fee and was earned immediately upon undertaking the representation. The letter further advised B.B. that G.A. and T.A. had agreed to pay the $30,000.00 retainer on B.B.'s behalf.

"33.     Finally, there was a draft document titled '2016_05_23+Third party fee agreement ltr,' which included G.A. and T.A.'s names and referenced B.B. and the 2016-CR-001428 case. This document was not signed.

"34.     In his response to the initial complaint, the respondent described his defense strategy and acknowledged that it created a conflict of interest between his representation of B.B. and T.A. The respondent described the defense strategy as:

'[T]he only alternative explanation was to suggest that [T.A.] May [*sic*] have been driving. Such a suggestion is inherently adverse to [T.A.]. It is also adverse to [T.A.] as it would require, the use of my past representation of her (specifically on prior DUI and other traffic cases) in order to help bolster the

6

defense and suggest to the jury that the theory was plausible enough to create reasonable doubt.'

"35.     The respondent further stated, 'I clearly believed, and acted, as if the waiver freed me from loyalty to [T.A.] and thereby allowed me to zealously, diligently and competently represent [B.B.].' Also, 'the prior representation of [T.A.] afforded me a knowledge of her history and record which others may not have had. This allowed me to be more aggressive on cross examination.'

"36.     Moreover, the respondent said that 'the waiver I had from [T.A.] allowed me to discard any prior duty of loyalty which may have prevented me from zealous representation of [B.B.] and therefore alleviated any taint of adversity the prior representation may have had.'

"37.     When asked about T.A.'s waiver during the *Van Cleave* hearing, the respondent was unable to remember what day T.A. signed the waiver. However, the respondent testified, 'I don't recall exactly when it was done. I know that it was done. I had the signed waiver, and I was not going to be proceeding in any substantive manner without it.'

"38.     In the respondent's computer file for the B.B. [*sic*] there were also two draft documents titled '2016_0921_WAIVER OF CONFLICT [B.B.]' and '20170518 [B.B.] WAIVER OF CONFLICT.'

"39.     The '2016_0921_WAIVER OF CONFLICT [B.B.]' draft included a case caption for the 2016-CR-001428 case in Sedgwick County District Court and stated:

'I, [B.B.], am being represented by the Maughan Law Group in the above captioned case. I am aware that a potential witness in this case, [T.A.], is a former client of the Maughan law group. I am aware that this creates a potential for a conflict of interests and have been fully apprised of the nature of the potential conflict of interests. Specifically, I am aware that Maughan Law Group

7

has a certain obligation of loyalty to their clients and their former clients. If [*sic*] [T.A.'s] interests and my own interests may be in conflict. Being fully aware of the nature of this conflict and having been advised that I have a right to seek independent counsel for advice on this matter, I hereby waive any potential conflict of interest arising from the Maughan Law Group's representation of [T.A.] and me.'

"40.     The '20170518 [B.B.] WAIVER OF CONFLICT' draft included a case caption for the 2016-CR-001428 case in Sedgwick County District Court and stated:

'I, [B.B.], am a client of the Maughan law group and the defendant in the above captioned case. I am aware that the a [*sic*] key witness, [T.A.], is a long time former client of Carl Maughan and the Maughan Law Group. I am aware that this creates a potential for a conflict of interests and have been fully apprised of the nature of the potential conflict of interest. Specifically, I have been advised that [T.A.'s] status as a client generally creates an obligation of loyalty to her on the part of the lawyers of the Maughan Law Group. It is my understanding that [T.A.] waived any conflict of interest that may arise as a result of Maughan Law Group's representation of me and I am satisfied that the attorneys of the Maughan Law Group have been released from their duty of loyalty to [T.A.]. Nevertheless an appearance of a conflict of interest exists[.] Being fully aware of the nature of this conflict and having been advised that I have a right to seek independent counsel for advice on this matter[,] I hereby waive any potential conflict of interest arising from the Maughan Law Group's prior representation of [T.A.] and their current representation of me in this matter.'

"41.     Neither of the drafts were signed by B.B. The respondent did not have any waiver signed by B.B. in his file.

"42.     The respondent testified during the disciplinary hearing that he knew that he had written waivers for both T.A. and B.B., but did not know why a signed waiver for B.B. was not in his file.

8

"43.    The respondent testified similarly during the *Van Cleave* hearing. Further, during that hearing, the respondent testified that:

'It was discussed multiple times, because I know it was even brought up in the midst of trial when [T.A.] took the stand, and I believe also at the prelim where I wanted her to be on the record as to what the relationship between [T.A.] and I was and that we had a signed waiver from both parties, but, yeah, my recollection is that we had this discussion about a waiver of conflict several times throughout the case.'

"44.    When asked during the *Van Cleave* hearing about the respondent's discussion with B.B. about a conflict of interest, B.B. testified that the respondent 'just mentioned that since he represented [T.A.] before numerous times that there might be a conflict, but he was going to talk to the judge about it and see what would transpire after that.'

"45.    B.B. further said that the respondent used the words 'conflict of interest' in a meeting but never really elaborated on it. B.B. said he did not 'understand what a conflict of interest was.'

"46.    When asked during the *Van Cleave* hearing why the respondent did not file the waivers he said he had with the district court in May 2017 when the court directed him to do so, the respondent testified, 'I guess I have no real excuse, other than I was a single attorney working a murder case on my own and there are lots of the movie [*sic*] parts, and I simply didn't get around to actually complying with the Court's order.'

"47.    On July 14, 2020, the district court heard oral arguments and ruled that B.B. and T.A. both freely, knowingly, and voluntarily waived the conflict after being adequately informed of the conflict of interest. Further, the district court held that B.B. and T.A. both waived the respondent's conflict both orally and in writing. The court found that the respondent obtained conflict waivers from both B.B. and T.A. consistent

9

with the Kansas Rules of Professional Conduct.

"48.    Further, the district court ruled that the fee charged for B.B.'s representation and paid by T.A. and G.A. was not unreasonable and did not create a conflict of interest.

"49.    The respondent testified during the disciplinary hearing that he would not have moved forward with any substantive representation of B.B. without a signed waiver from both T.A. and B.B. The respondent further said that he may have shredded the paper copy of B.B.'s signed waiver before saving it.

"50.    The respondent further testified that in 2016 and 2017, he experienced several professional and personal issues that impacted his ability to practice law. In mid-2016, the respondent's longtime assistant left for another job. After that, the respondent employed several part time assistants, but those assistants were not familiar with his scanning and filing procedures for client files. The respondent suspected that some of the waivers may not have been saved because his typical filing process was interrupted by staffing changes during this time.

"51.    In addition, in early 2017, the sole other attorney at the respondent's firm, an associate, left the practice for other employment. This left the respondent as the sole attorney at his firm.

"52.    Also, in 2016 the respondent's wife was deployed as part of her army reserve unit, leaving the respondent to care for their two children on his own. The respondent had also filed to run for a district court judge position around that time, was in the process of having a new house built, was moving to the new residence, and had just been asked by the State Board for Indigent Defense Services to handle criminal defense appeals that the state appellate defender office was unable to take. The respondent testified that he did not understand the volume [of] work the Board intended to send him, which wound up being approximately 200 appellate cases. The respondent said that he

10

and his associate were filing approximately two briefs per week in 2016 and that year was the busiest time of the respondent's professional life.

"53.     The respondent testified that during his representation of B.B. he was barely coping with everything and was likely dealing with depression.

"*Van Cleave Appeal*

"54.     On December 10, 2021, the Court of Appeals reversed the district court's *Van Cleave* ruling and remanded the matter for a new trial. In its unpublished memorandum opinion, the Court of Appeals held that: 'While [T.A.] was not a codefendant, Maughan acted like she should become one. Maughan presented a theory of defense which directly inculpated his former and current client, thereby making his representation of [B.B.] directly adverse to [T.A.]. See KRPC 1.7(a)(1).'

"55.     Further, the Court of Appeals held, 'We also cannot say the predicament Maughan entered did not objectively create a substantial risk that his representation of [B.B.] would be materially limited by his responsibilities to [T.A.]. See KRPC1.7(a)(2).'

"56.     The Court of Appeals further held that B.B.'s written waiver was insufficient on its face and that:

'[B.B.] did not waive his right to a conflict-free attorney. [Citation omitted.] Based on the record before us, we cannot find [B.B.] was informed and aware of the risks associated with Maughan's representation, nor can we find [T.A.'s] waiver sufficiently freed Maughan to provide conflict-free representation to [B.B.].'

"57.     The Court of Appeals held that the district court's finding that the respondent's representation of B.B. was not adversely affected by the conflict was not supported by substantial competent evidence.

11

"58.     The Court of Appeals also held that the district court erred in finding that the respondent's flat-fee structure did not create a conflict.

'The failure of either written waiver to mention the fee arrangement is significant because, under KRPC 1.8 (2021 Kan. S. Ct. R. 345), [B.B.] had to waive the conflict created by [T.A] and [G.A.'s] payment of his legal fees in writing. While the *Van Cleave* court analyzed the fee agreement under KRPC 1.5 (finding it to be reasonable), KRPC 1.8 is also implicated.'

"59.     The Court of Appeals ultimately concluded: 'Because we find Maughan had an actual conflict of interest (which [B.B.] did not waive) that adversely affected Maughan's representation, [B.B.'s] convictions must be reversed, and we remand for a new trial with different counsel.'

"60.     During the disciplinary hearing, the Sedgwick County prosecutor who handled B.B.'s case, Aaron Breitenbach, testified that after the Court of Appeals remanded the case, the matter was set back to square one. The case was scheduled for preliminary hearing the day following the disciplinary hearing, December 8, 2023.

"61.     The individuals in the vehicle that B.B. and T.A.'s vehicle crashed into were two employees of a business that assists with development and independence of adults with intellectual disabilities as well as three individuals who were clients of the company being transported by the employees. The media covered the case closely.

"62.     Mr. Breitenbach testified that family members of both deceased victims attended a number of the original pretrial hearings, were present for the original trial, and were engaged throughout the process. There was also some engagement by the two employee victims and the family of the remaining surviving victim. Several of these victims and family members are now reengaged in the process and will appear again for the remanded proceeding.

"63.     Mr. Breitenbach also testified that the district attorney's office has had

12

some difficulty locating some of the witnesses now since more than seven years have passed since the crash. Because some witnesses have been difficult to locate, concern over how a jury will evaluate the case under these circumstances, and not wanting to place undue stress on the victims and families of the deceased victims, the district attorney's office is considering a plea agreement that would involve lower charges and/or less time in custody than was originally considered.

"64. Mr. Breitenbach said that B.B. has remained in custody from his arrest in May 2016 to present. B.B. was transferred to KDOC custody after sentencing in the original proceeding but was brought back to the Sedgwick County Jail after the remand in May 2022. Mr. Breitenbach testified that the county jail is used more as a short-term placement so that defendants can be close to the court their case is being handled in and that KDOC is a long-term placement with more programs and opportunities for rehabilitation for inmates.

"*Conclusions of Law*

"65. Based upon the findings of fact, the hearing panel concludes as a matter of law that the respondent violated KRPC 1.7 (conflict of interest: current clients), 1.8 (conflict of interest: current clients: specific rules), 1.15 (safekeeping property), and 8.4(d) (misconduct prejudicial to the administration of justice), as detailed below.

"KRPC 1.7

"66. KRPC 1.7 provides:

'(a) Except as provided in paragraph (b), a lawyer shall not represent a client if the representation involves a concurrent conflict of interest. A concurrent conflict of interest exists if:

(1) the representation of one client will be directly adverse to another client; or

13

(2) there is a substantial risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client or a third person or by a personal interest of the lawyer.'

'(b) Notwithstanding the existence of a concurrent conflict of interest under paragraph (a), a lawyer may represent a client if:

(1) the lawyer reasonably believes that the lawyer will be able to provide competent and diligent representation to each affected client;

(2) the representation is not prohibited by law;

(3) the representation does not involve the assertion of a claim by one client against another client represented by the lawyer in the same litigation or other proceeding before a tribunal; and

(4) each affected client gives informed consent, confirmed in writing.'

"67. The rules do not permit the respondent to represent clients with conflicting interests without taking certain steps. In this case, there was a conflict of interests between B.B. and T.A.

"68. Under KRPC 1.7(a)(2), the respondent had certain responsibilities to T.A. as a current and former client. Under KRPC 1.6 and KRPC 1.9(c), the respondent was prohibited from using information relating to his prior representation of T.A. to T.A.'s disadvantage or to reveal information relating to his representation of T.A. While

14

the respondent claimed that he had no duty of loyalty to T.A. after she signed the waiver, the fact remained that he still had obligations to T.A. as a current and former client.

"69.    A lawyer is prohibited from representing a client when there is a concurrent conflict of interest unless 'each affected client gives informed consent, confirmed in writing.' KRPC 1.7(b)(4). '"Informed consent" denotes the agreement by a person to a proposed course of conduct after the lawyer has communicated adequate information and explanation about the material risks of any reasonably available alternatives to the proposed course of conduct.' KRPC 1.0(f). '"Confirmed in writing" when used in reference to the informed consent of a person, denotes informed consent that is given in writing by the person or a writing that a lawyer promptly transmits to the person confirming an oral informed consent.' KRPC 1.0(b).

"70.    While the respondent claimed that the waiver T.A. signed absolved him of all obligations to T.A., there is no evidence that the respondent's responsibilities to T.A. were waivable or, if they were, that T.A. was properly informed of what information the respondent knew from his representation of her that could be used to her disadvantage. The written waiver itself did not specify the risks or reasonable alternatives associated with the proposed representation of B.B. Notably, the respondent said that T.A. should consult with an attorney about her rights under the Fifth Amendment when it came to her testimony in B.B.'s trial, because the respondent recognized that T.A. faced risks of her own in the case.

"71.    Further, there is a lack of evidence that B.B. was properly informed of the conflict between the respondent's obligations to T.A. and his representation of B.B. The respondent was unable to produce a written waiver signed by B.B. But, more importantly, the draft waivers in the respondent's file do not adequately address the conflict and there was no other evidence that B.B. was properly informed of the conflict, the risks associated with [t]he conflict, or any reasonable alternatives.

"72.    The hearing panel agrees with the Court of Appeals' application of KRPC 1.7 to the respondent's representation of B.B[.], including its holding that the

15

respondent had a conflict that was not properly waived by B.B. The hearing panel additionally concludes that the respondent had a conflict that was not properly waived by T.A.

"73.    The respondent stipulated that he violated KRPC 1.7.

"74.    Accordingly, the hearing panel concludes that the respondent violated KRPC 1.7.

"KRPC 1.8

"75.    KRPC 1.8(f) permits a lawyer to accept compensation for representing a client from one other than the client only under certain circumstances:

> '(f)    A lawyer shall not accept compensation for representing a client from one other than the client unless:
>
> (1)  the client gives informed consent;
>
> (2)  there is no interference with the lawyer's independence of professional judgment or with the client-lawyer relationship; and
>
> (3)  information relating to representation of a client is protected as required by Rule 1.6.'

"76.    'If . . . the fee arrangement creates a conflict of interest for the lawyer, then the lawyer must comply with Rule 1.7.' KRPC 1.8, Cmt. 12. 'Under Rule 1.7(b), the informed consent must be confirmed in writing.' KRPC 1.8, Cmt. 12.

"77.    In a letter to B.B. dated May 23, 2016, the respondent discussed payment of $30,000.00 by G.A. and T.A. for his representation of B.B. The letter was not signed

16

by B.B., but even if it was, nothing in the letter informed B.B. of the risks and reasonable alternatives associated with the respondent's acceptance of the flat fee payment from G.A. and T.A. to represent B.B. The letter made no mention of T.A.'s involvement as a witness in the case, T.A.'s having been in the vehicle with B.B., or the defense strategy to argue that T.A. was driving when the crash occurred.

"78.    B.B. was not properly informed of the nature of the conflict that payment of the $30,000.00 flat fee by G.A. and T.A. posed and did not provide informed consent to the payment arrangement, confirmed in writing, as required under Rule 1.8.

"79.    Further, the respondent stipulated that he violated KRPC 1.8.

"80.    Accordingly, the hearing panel concludes that the respondent violated KRPC 1.8.

"KRPC 1.15(a)

"81.    Lawyers must properly safeguard their clients' property. KRPC 1.15(a) specifically provides, in part, that:

> '(a)    A lawyer shall hold property of clients or third persons that is in a lawyer's possession in connection with a representation separate from the lawyer's own property. Funds shall be kept in a separate account maintained in the state of Kansas.'

"82.    In this case, the respondent failed to properly safeguard the $30,000.00 flat fee paid for B.B.'s representation by depositing it into his operating account instead of his trust account.

"83.    The respondent testified that, while he has since learned that this is not permitted under the rules, he considered the $30,000.00 earned upon receipt. However, review of *In re Thurston* clarifies that the KRPC do not permit this:

17

'A lawyer may charge a flat fee to a client for a specific task to be undertaken. When the flat fee is paid to the lawyer, it must be deposited into the lawyer's trust account and the fee cannot be withdrawn until it is earned. Since a flat fee is not earned until completion of the task, the entire flat fee must remain in the lawyer's trust account until that task is completed unless the lawyer and client otherwise agree to partial withdrawals based upon the amount earned for completion of specified subtasks.' *In re Thurston*, 304 Kan. 146, [149], 371 P.3d 879 (2016).

"84.     The respondent had not yet earned the fee when he deposited these funds into his operating account and commingled them with his own funds.

"85.     Further, the respondent stipulated that he violated KRPC 1.15.

"86.     Accordingly, the hearing panel concludes that the respondent failed to properly safeguard the $30,000.00 flat fee paid by G.A. and T.A. for B.B.'s representation, in violation of KRPC 1.15.

"KRPC 8.4(d)

"87.     'It is professional misconduct for a lawyer to . . . engage in conduct that is prejudicial to the administration of justice.' KRPC 8.4(d).

"88.     The respondent engaged in conduct that was prejudicial to the administration of justice when he undertook the representation of B.B., at the same time he represented T.A. in another matter, and accepted payment for that representation from G.A. and T.A. without ensuring all parties were properly informed of the risks and alternatives to the arrangement.

"89.     As a result of the respondent's conduct, not only must a second trial be held, but the case reverted back to the beginning of the respondent's representation of B.B., with a second preliminary hearing occurring the day after this disciplinary hearing

18

was held. Mr. Breitenbach testified that this placed an undue burden on resources of the criminal justice system, the State's witnesses, and the victims and their families.

"90.     The respondent stipulated that he violated KRPC 8.4(d).

"91.     Accordingly, the hearing panel concludes that the respondent violated KRPC 8.4(d).

"*American Bar Association Standards for Imposing Lawyer Sanctions*

"92.     In making this recommendation for discipline, the hearing panel considered the factors outlined by the American Bar Association in its Standards for Imposing Lawyer Sanctions (hereinafter 'Standards'). Pursuant to Standard 3, the factors to be considered are the duty violated, the lawyer's mental state, the potential or actual injury caused by the lawyer's misconduct, and the existence of aggravating or mitigating factors.

"93.     *Duty Violated*. The respondent violated his duty to his clients B.B. and T.A., to the legal profession, and to the legal system.

"94.     *Mental State*. The respondent knowingly violated his duty.

"95.     *Injury*. As a result of the respondent's misconduct, the respondent caused injury to the legal system and the legal profession by casting doubt on his representation of B.B. to the extent that B.B.'s case had to be retried. This injured B.B., by having to endure a new trial, as well as all of the witnesses and victims who will have to go through the process for a second time. B.B. was further injured by the uncertainty over whether his counsel represented conflicting interests. Further, B.B. has spent an extended time in custody with the uncertainty of how his case will resolve and in a facility that offers fewer opportunities to inmates than he otherwise would have been placed. T.A. was also injured through the respondent's use of information learned during his representation of

19

T.A. in his questioning of her and his attempt to show that T.A. was the driver of the vehicle that caused the crash.

"96.    In addition to the above-cited factors in Standard 3, the hearing panel has thoroughly examined and considered the following Standards:

'4.12   Suspension is generally appropriate when a lawyer knows or should know that he is dealing improperly with client property and causes injury or potential injury to a client.'

'4.13   Reprimand is generally appropriate when a lawyer is negligent in dealing with client property and causes injury or potential injury to a client.'

'4.32   Suspension is generally appropriate when a lawyer knows of a conflict of interest and does not fully disclose to a client the possible effect of that conflict, and causes injury or potential injury to a client.'

'7.2    Suspension is generally appropriate when a lawyer knowingly engages in conduct that is a violation of a duty owed as a professional and causes injury or potential injury to a client, the public, or the legal system.'

'7.3    Reprimand is generally appropriate when a lawyer negligently engages in conduct that is a violation of a duty owed as a professional, and causes injury or potential injury to a client, the public, or the legal system.'

20

"97.      Aggravating circumstances are any considerations or factors that may justify an increase in the degree of discipline to be imposed. In reaching its recommendation for discipline, the hearing panel, in this case, found the following aggravating factors present:

"98.      *Prior Disciplinary Offenses*. The respondent has been previously disciplined on two occasions. On April 18, 2007, the respondent was placed on diversion for violation of KRPC 1.3 (diligence). On December 29, 2010, the respondent was placed on diversion for violation of KRPC 3.1. The respondent successfully completed both diversions, and those matters were dismissed.

"99.      *Multiple Offenses*. The respondent committed multiple rule violations. The respondent violated KRPC 1.7 (conflict of interest: current clients), 1.8 (conflict of interest: current clients: specific rules), 1.15 (safekeeping property), and 8.4(d) (misconduct prejudicial to the administration of justice). Accordingly, the hearing panel concludes that the respondent committed multiple offenses.

"100.      *Vulnerability of Victim*. As the defendant in a criminal case being held in custody, B.B. was vulnerable to the respondent's misconduct. B.B. had applied for representation by the public defender's office, but said that an attorney from that office never showed up. The respondent did, however, show up at the jail and said he would represent B.B. With what probably appeared as limited options for counsel, B.B. preferred to have retained counsel represent him. Further, the victims and families of the victims in the criminal matter were vulnerable to the respondent's misconduct. It has led to their having to participate in the criminal process for a second time in the same case.

"101.      *Substantial Experience in the Practice of Law*. The Kansas Supreme Court admitted the respondent to practice law in the State of Kansas in 1997. At the time of the misconduct, the respondent has been practicing law for approximately 19 years. The hearing panel concludes that the respondent had substantial experience in the

21

practice of law when the misconduct occurred.

"102. Mitigating circumstances are any considerations or factors that may justify a reduction in the degree of discipline to be imposed. In reaching its recommendation for discipline, the hearing panel, in this case, found the following mitigating circumstances present:

"103. *Absence of a Dishonest or Selfish Motive*. The respondent's misconduct does not appear to have been motivated by dishonesty or selfishness.

"104. *Personal or Emotional Problems if Such Misfortunes Have Contributed to Violation of the Kansas Rules of Professional Conduct*. The respondent was dealing with multiple professional and personal struggles that contributed to his misconduct. The respondent had lost his longtime legal assistant and eventually his only associate attorney, leaving him as a solo practitioner by the time of trial. Further, the respondent's case load was significantly increased due to his agreeing to accept around 200 appeal matters from the State Board of Indigent Defense services. Further, the respondent's wife was deployed overseas for one year during this time, leaving him to care for their two children on his own. At this same time the respondent was also running for a district judge position, building a new house, and moving his belongings to his family's new residence. The respondent testified that this was the busiest time of his professional career and he was barely coping during this time. It is clear the respondent's personal and professional struggles caused him to be less aware of his responsibilities under the KRPC and contributed to his misconduct.

"105. *Timely Good Faith Effort to Make Restitution or to Rectify Consequences of Misconduct*. In his proposed probation plan, filed on November 23, 2023, the respondent offers to pay $1,500.00 to the Kansas Victim's Compensation fund. The respondent testified during the disciplinary hearing that he has not paid this yet. If payment to this or a similar organization is made, the hearing panel would consider this a mitigating factor.

"106.     *The Present and Past Attitude of the Attorney as Shown by His or Her Cooperation During the Hearing and His or Her Full and Free Acknowledgment of the Transgressions.* The respondent fully cooperated with the disciplinary process. Additionally, the respondent admitted the facts that gave rise to the violations and stipulated during the disciplinary hearing that he violated KRPC 1.7, 1.8, 1.15, and 8.4(d). The hearing panel concludes that this is a mitigating factor.

"107.     *Remorse.* At the hearing on this matter, the respondent expressed genuine remorse for having engaged in the misconduct. The respondent understood that his conduct violated the rules and had a negative impact on the criminal case overall. The hearing panel concludes this is a mitigating factor.

"108.     *Remoteness of Prior Offenses.* The misconduct which gave rise to the respondent's two prior diversions in 2007 and 2010 is remote in time and character to the misconduct in this case. The hearing panel concludes this is a mitigating factor.

"109.     *Adjustments to the Respondent's Professional Career.* The respondent has adjusted his professional career from one where he was at higher risk for the type of misconduct involved in this case to working for a single employer. The hearing panel considers this as evidence that the respondent has carefully considered and is aware of the circumstances that contributed to his misconduct and has adjusted his work in an attempt to ensure it does not happen again. The hearing panel concludes this is a mitigating factor.

"110.     *Recognition of conflict of interests.* While the respondent did not properly address the conflict of interests involved in representing B.B., the respondent was, at least, aware that they may be an issue. Further, the respondent brought it up with the district court with the district attorney's office, B.B., and T.A. present in court in order to make all parties aware the conflict existed. The district court did not find that the conflict prevented the respondent from representing B.B., but directed the respondent to file copies of the written waivers with the court. While his attempt to address the conflict was not ultimately effective, the hearing panel considers this a mitigating factor.

23

"111.    The disciplinary administrator recommended that the respondent be suspended for a period of six months, with the suspension being stayed while the respondent is placed on probation for 12 months under the terms of the respondent's proposed probation plan, filed November 23, 2023.

"112.    The respondent recommended that he be placed on probation for 12 months under the terms of the respondent's proposed probation plan, filed November 23, 2023.

"*Discussion*

"113.    When a respondent requests probation, the hearing panel is required to consider Rule 227, which provides:

> '(d)    Restrictions on Recommendation of Probation. A hearing panel may not recommend that the respondent be placed on probation unless the following requirements are met:
>
>> (1) the respondent complies with subsections (a) and (c) and the proposed probation plan satisfies the requirements in subsection (b);
>>
>> (2) the misconduct can be corrected by probation; and
>>
>> (3) placing the respondent on probation is in the best interests of the legal profession and the public.'

"114.    The respondent developed a workable, substantial, and detailed plan of probation. The respondent provided a copy of the proposed plan of probation to the

24

disciplinary administrator and each member of the hearing panel at least 14 days prior to the hearing on the formal complaint. The respondent put the proposed plan of probation into effect prior to the hearing on the formal complaint by complying with each of the terms and conditions of the probation plan. The misconduct, in this case, can be corrected by probation. Placing the respondent on probation is in the best interests of the legal profession and the citizens of the State of Kansas.

"115.    While the hearing panel concludes that the probation plan is adequate to meet the requirements of Rule 227, the haring [*sic*] panel further recommends that the respondent be required under the plan to enter into a monitoring agreement with KALAP and follow all recommendations of KALAP under that agreement. The respondent testified that his mental health has suffered during the time of the misconduct, which may continue to the present. The hearing panel recommends that the respondent work with KALAP to address those concerns.

"116.    Further, the hearing panel recommends that it be a condition of his probation that the respondent notify both his probation supervisor and the disciplinary administrator's office within 14 days if during the term of probation he no longer works for a single employer and returns to the private practice of law.

"*Recommendation of the Hearing Panel*

"117.    Accordingly, based upon the findings of fact, conclusions of law, and the Standards listed above, the hearing panel unanimously recommends that the respondent be suspended for a period of six (6) months. The hearing panel further recommends that the suspension be stayed and the respondent be placed on probation for a period of twelve (12) months according to the terms of the respondent's proposed probation plan, adding the suggestions of the hearing panel regarding KALAP monitoring and reporting to his supervisor and the disciplinary administrator's office if the respondent returns to private practice.

25

"118.    Costs are assessed against the respondent in an amount to be certified by the Office of the Disciplinary Administrator."

## DISCUSSION

In a disciplinary proceeding, this court considers the evidence, the panel's findings, and the parties' arguments to determine whether KRPC violations exist and, if they do, what discipline should be imposed. Attorney misconduct must be established by clear and convincing evidence. *In re Murphy*, 312 Kan. 203, 218, 473 P.3d 886 (2020); see Supreme Court Rule 226(a)(1)(A) (2024 Kan. S. Ct. R. at 279). "'Clear and convincing evidence is "evidence that causes the factfinder to believe that 'the truth of the facts asserted is highly probable.'"'" 312 Kan. at 218.

The respondent was given adequate notice of the formal complaint, to which he filed an answer. The respondent filed no exceptions and, in fact, stipulated to the underlying facts supporting the alleged violations. Therefore, the panel's factual findings are considered admitted. Supreme Court Rule 228(g)(1), (2) (2024 Kan. S. Ct. R. at 281-82).

The respondent also stipulated to the alleged violations, but even if he had not, the evidence before the hearing panel clearly established the charged misconduct violated KRPC 1.7 (2024 Kan. S. Ct. R. at 339) (shall not represent a client if the representation involves a concurrent conflict of interest), KRPC 1.8 (2024 Kan. S. Ct. R. at 347) (shall not enter into a business transaction with a client or knowingly acquire an ownership, possessory, security or other pecuniary interest adverse to client), KRPC 1.15 (2024 Kan. S. Ct. R. at 372) (shall hold property of clients or third persons that is in a lawyer's possession in connection with a representation separate from the lawyer's own property),

26

and KRPC 8.4(d) (2024 Kan. S. Ct. R. at 430) (engage in conduct that is prejudicial to the administration of justice).

After the hearing panel issued its report, the Clerk of the Appellate Courts set the case for oral argument under Rule 228(i) (2024 Kan. S. Ct. R. at 286). The Clerk of the Appellate Courts filed an affidavit on May 15, 2024, providing the following information. On March 27, 2024, the Clerk sent to the respondent's registered address, by regular and certified mail, a copy of the 2024 May docket of the Kansas Supreme Court scheduling the respondent's case for oral argument on Friday, May 10, 2024, at 10:30 a.m. See Rule 206(n) (2024 Kan. S. Ct. R. at 258) (requiring attorneys register contact information including residential and business addresses). The Clerk received a return receipt bearing the signature of Katy Beedles confirming the certified mail was delivered. On April 15, 2024, the Clerk sent to the respondent by regular and certified mail, return receipt requested, an appearance letter confirming the matter had been set on the Supreme Court's May 2024 docket and advising the respondent that he should be in the Supreme Court Courtroom no later than 10:15 a.m. on Friday, May 10, 2024. The address used for the mailing of the appearance letter was the same as the address used in the mailing of the docketing notice and notice of oral argument. As of the date of his affidavit, May 15, 2024, the Clerk had not received a return receipt from the mailing of the appearance letter.

The Clerk states in his affidavit that, at approximately 10:15 a.m. on the morning of May 10, 2024, the respondent called the Office of the Clerk of the Appellate Courts advising that he knew he was scheduled to appear on the 10:30 a.m. docket but was having car trouble an hour away from Topeka. The respondent ultimately failed to appear for the argument on May 10, 2024. The court determined it was appropriate to proceed without respondent's appearance, as respondent had actual notice of the charges pending

27

against him, as evidenced by his stipulation to the underlying facts and the alleged violations, and actual notice of oral argument in his case scheduled for Friday, May 10, 2024, at 10:30 a.m., as evidenced by the return receipt of certified mail and the information provided by the respondent to the Clerk on the morning of the scheduled argument.

Given the respondent's stipulation to the underlying facts alleged and the resulting violations, the only issue left for us to resolve is the appropriate discipline. At the time of the hearing before the panel, the Disciplinary Administrator recommended the respondent be suspended for a period of 6 months, with the suspension being stayed while the respondent is placed on probation for 12 months under the terms of the respondent's proposed probation plan filed November 23, 2023. The respondent recommended he be placed on probation for 12 months under the terms of the respondent's proposed probation plan filed November 23, 2023. The hearing panel ultimately adopted the Disciplinary Administrator's recommendation with the additional suggestion of KALAP monitoring and the respondent reporting to his supervisor and the Disciplinary Administrator's office if the respondent returns to private practice.

At oral argument, however, the Deputy Disciplinary Administrator changed the Disciplinary Administrator's initial recommendation. Instead of a 6-month suspension stayed pending successful completion of a 12-month probation plan, the Deputy Disciplinary Administrator recommended a 1-year suspension with a required reinstatement hearing. In withdrawing the recommendation of probation and recommending an extended term of suspension with a reinstatement hearing, the Deputy Disciplinary Administrator highlighted the respondent's failure to comply with Supreme Court Rule 227(f)(2) (2024 Kan. S. Ct. R. at 281). This rule requires a respondent seeking probation to file with the Supreme Court and serve the Disciplinary Administrator—at

28

least 14 days before oral argument—a copy of an affidavit describing the respondent's compliance with each condition of the respondent's proposed probation plan to date. We have reviewed the docket sheet in this matter and, as alleged, we find the respondent failed to file his affidavit certifying compliance with the terms of the proposed probation plan.

We have carefully considered the panel's factual findings and legal conclusions, to which the respondent stipulated. We also have considered the respondent's failure to comply with Supreme Court Rule 227(f)(2) (2024 Kan. S. Ct. R. at 281). In light of this evidence, as well as the ABA Standards for Imposing Lawyer Sanctions, we order the respondent's license be suspended for one year and that the respondent undergo a reinstatement hearing under Supreme Court Rule 232 (2024 Kan. S. Ct. R. at 290) before his petition for reinstatement will be considered by this court.

CONCLUSION AND DISCIPLINE

IT IS THEREFORE ORDERED that Carl F.A. Maughan is suspended for a period of one year from the practice of law in the state of Kansas, effective from the date this opinion is filed, with the requirement that he undergo a reinstatement hearing under Supreme Court Rule 232 before his petition for reinstatement will be considered by this court.

IT IS FURTHER ORDERED that the costs of these proceedings be assessed to the respondent and that this opinion be published in the official Kansas Reports.